## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BILLY NATION,

        Plaintiff,

v.                                  Case No. 8:23-cv-4-CEH-MRM

DEPUY ORTHOPAEDICS, INC., et al.

        Defendants.

_____

## PLAINTIFF'S AMENDED COMPLAINT
## DEMAND FOR JURY TRIAL

Plaintiff, by and through the undersigned attorneys, files this Amended Complaint against the Defendants and in support thereof would show as follows:

### I.      PARTIES

1.      Plaintiff, Billy Nation, is an adult resident of Polk County, Florida.

2.      Defendant DePuy Orthopaedics, Inc. is an Indiana corporation with its principal place of business located at 700 Orthopaedic Drive, Warsaw, Indiana 46581. Upon information and belief, Defendant DePuy Orthopaedics, Inc. is a wholly owned subsidiary of Defendant DePuy, Inc.

3.      Defendant DePuy, Inc. is a Delaware corporation with its principal place of business located at 700 Orthopaedic Drive, Warsaw, Indiana 46581. Upon

- 1 -

information and belief, Defendant DePuy Inc. is a wholly owned subsidiary of Defendant Johnson & Johnson International.

4.    Defendant DePuy International Limited is a corporation organized and existing pursuant to the laws of the United Kingdom, with its principal place of business located at St. Anthonys Road, Leeds, West Yorkshire, LS11 8DT.

5.    Defendant Johnson & Johnson is a New Jersey corporation with its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

6.    Defendant Johnson & Johnson Services, Inc., is a New Jersey corporation with its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

7.    Defendant, Johnson & Johnson International, is a New Jersey corporation with its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.  Upon information and belief, Defendant Johnson & Johnson International is a wholly owned subsidiary of Defendant Johnson & Johnson.

8.    At all relevant times, each Defendant was the representative, agent, employee or alter ego of the other Defendant, and in doing the things alleged herein was acting within the scope of its authority as such.

## II.    JURSIDICTION AND VENUE

9.    This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. § 1332(a) because the Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

10.    Venue is proper in this district pursuant to 28 U.S.C. § 1407 and the remand order entered by Hon. Ed Kinkeade which remanded this case to this district on December 30, 2022.

## III.    BACKGROUND

### A.    THE DEPUY PINNACLE® ACETABULAR CUP SYSTEM IS DEFECTIVE, UNSAFE AND HAS NOT BEEN ADEQUATELY TESTED

11.    The hip joint connects the thigh (femur) bone of a patient's leg to the patient's pelvis. The hip joint is often characterized as a ball and socket joint. The acetabulum is the cup shaped socket portion of the hip and the femoral head (ball) at the top of the femur bone rotates within the curved surface of the acetabulum.

12.    A total hip system replaces the body's natural joint with an artificial one, usually made out of metal, plastic or ceramic. A typical hip replacement system consists of four separate components: (1) a femoral stem, (2) a femoral head, (3) a liner (bearing surface), and (4) an acetabular shell. After the surgeon hollows out a patient's femur bone, the metal femoral stem is implanted. The femoral head is usually a metal ball that is fixed on top of the femoral stem. The femoral head forms the hip joint that can rotate when it is placed inside a plastic, ceramic or metal liner that is attached to the interior portion of the metal acetabulum cup (socket) comprised of metal on its

outer shell. When complete, the femoral stem anchors the metal femoral head that rotates within the liner sitting inside the acetabular cup.

13. Defendants developed, designed, tested, manufactured, distributed, and sold the Pinnacle Acetabular Metal on Metal Hip System ("Pinnacle MoM Device") which is a hip bearing system to be used in a total hip replacement or revision surgery. The Pinnacle MoM Device system includes two component parts: the liner and acetabular cup. Defendants developed, designed, tested, manufactured, and distributed at least four different metal acetabular cups and three different liners to be used as the Pinnacle MoM Device. The acetabulum cup is comprised of titanium metal on its outer shell and can be fixed to the bone with screws or without screws by growing into the bone with Defendants Gription™ porous technology. The Pinnacle MoM Device has three different liners to choose from made of cobalt-chromium metal, polyethylene plastic or ceramic. One of the cobalt-chromium metal liners is the Ultamet® XL.

14. The Pinnacle MoM Device is critically different than most hip replacement devices because a metal acetabular liner may be used instead of a polyethylene plastic acetabular liner. The Pinnacle MoM Device with a metal liner, such as the Ultamet® XL, is a "metal-on-metal" device due to the fact that both articulating surfaces - the femoral head (ball) and acetabulum liner (socket) - are comprised of cobalt-chromium (CoCr) metal. Therefore, the metal-on-metal design forces metal to rub against metal with the full weight and pressure of the human body creating metallic debris to be released into the Plaintiff's hip socket and blood stream.

Because of Defendants' defective design for the Pinnacle MoM Device, hundreds of patients – including Plaintiff – have been forced to undergo surgeries to replace the failed hip implants.

15.    Defendants describe the Pinnacle MoM Device as "the only product available that provides the option of choosing a polyethylene or metal insert for use with the same outer titanium cup that replaces the socket of the natural hip."

16.    Defendants developed, designed, tested, manufactured, and distributed the metal and ceramic femoral heads that are used with the Pinnacle MoM Device that directly contact the liner. The Articul/Eze M-Spec Femoral Head and the aSphere M-Spec Femoral Head are metal femoral heads commonly used with the Pinnacle MoM Device.

17.    The Pinnacle MoM Device is fully compatible with DePuy's complete line of advanced femoral stems that Defendants develop, design, test, manufacture, and distribute such as the AML®, Prodigy®, Summit™, Corail®, Tri-Lock®, and S-ROM femoral stems and sleeves.

18.    The Pinnacle MoM Device is a Class III medical device.  Class III devices are those that operate to sustain human life, are of substantial importance in preventing impairment of human health, or pose potentially unreasonable risks to patients.

19.    The Medical Device Amendments to the Food, Drug, and Cosmetics Act of 1938 ("MDA"), in theory, require Class III medical devices, including the Pinnacle MoM Device, to undergo premarket approval by the FDA.  Premarket approval is a

process which obligates the manufacturer to design and implement a clinical investigation and submit the results of the investigations to the FDA.

20.     Premarket approval is a rigorous process that requires a manufacturer to submit what is typically a multivolume application that includes, among other things, full reports of all studies and investigations of the device's safety and effectiveness that have been published or should reasonably be known to the applicant; a full statement of the device's components, ingredients, and properties, and of the principle or principles of operation; a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of such device; samples or device components required by the FDA; and, a specimen of the proposed labeling.

21.     The FDA may grant premarket approval only if it finds that there is reasonable assurance that the medical device is safe and effective and must weigh any probable benefit to health from the use of the device against any probable risk of injury or illness from such use.

22.     A medical device on the market prior to the effective date of the MDA – a so-called "grandfathered" device – was not required to undergo premarket approval.

23.     In addition, a medical device marketed after the MDA's effective date may bypass the rigorous premarket approval process if the device is "substantially equivalent" to a pre-MDA device (i.e., a device approved prior to May 28, 1976).  This exception to premarket approval is known as the "510(k)" process and simply requires the manufacturer to notify the FDA under section 510(k) of the MDA at least 90 days

prior to the device's introduction on the market of the manufacturer's intent to market a device, and to explain the device's substantial equivalence to a pre-MDA predicate device.  The FDA may then approve the new device for sale in the United States.

24.    The MDA does not require an FDA determination that the device is in fact substantially equivalent to a grandfathered device.

25.    Instead of assuring the safety of the Pinnacle MoM Device through clinical trials, Defendants sought to market the Pinnacle MoM Device without conducting any clinical trials by obtaining FDA approval under section 510(k).  To that end, Defendants submitted a section 510(k) premarket notification of intent to market the Pinnacle MoM Device.

26.    By telling the FDA that the Pinnacle MoM Device's design was "substantially equivalent" to other hip components and products on the market, Defendants were able to avoid the safety review required for premarket approval under FDA regulations, which includes clinical trials.

27.    The FDA cleared the Pinnacle MoM Device for sale by means of the abbreviated 510(k) process and consequently the FDA did not require the Pinnacle MoM Device to undergo clinical trials.

28.    The 510(k) notification for the Pinnacle MoM Device includes Defendants assertion that it believes the Pinnacle MoM Device to be substantially equivalent to grandfathered devices - devices that were never required to be reviewed for safety and effectiveness.

29.     Significantly, unlike the premarket approval process, the 510(k) notification process does not call for scrutiny – or even clinical testing – of a device's safety and effectiveness.

30.     A finding of substantial equivalence is not equivalent to a finding of a device's safety and effectiveness.

31.     Thus, the FDA's finding of "substantial equivalence" had nothing to do with reviewing the Pinnacle MoM Device's safety and effectiveness, but rather only a determination of equivalence to grandfathered devices that never underwent safety and effectiveness review.

32.     Defendants sold approximately 150,000 Pinnacle MoM Devices.

**B.    AFTER RECEIVING OVER 1,300 REPORTED ADVERSE EVENTS, DEFENDANTS SHOULD HAVE RECALLED OR NOTIFIED THE PUBLIC AND HEALTH CARE INDUSTRY OF THE DEFECTIVE PROBLEMS.   INSTEAD, DEFENDANTS HAVE CONTINUED TO MARKET THE PINNACLE MOM DEVICE.**

33.     Defendants have received over 1,300 reports associated with the Pinnacle MoM Device since 2002, and the number is expected to grow.  From January 1, 2011 to March 31, 2011, the FDA received over 250 self-reported adverse events regarding the Pinnacle MoM Device (metal-on-metal).  Reported symptoms range from pain, infection, inflammation, feeling as if hip is dislocating, heavy metal poisoning (metallosis) confirmed by blood tests resulting in eventual revision, ARMD (Adverse Reaction to Metal Debris) and necrotic tissue in and around the hip joint, catastrophic failure, premature wear, disarticulation, and disassembly.

34.    In May 2002, shortly after Defendants began selling the Pinnacle MoM Device, Defendants received two complaints.  One reported that a patient had to undergo revision surgery to remove and replace the Pinnacle MoM Device because the liner disassociated with the cup.  The other reported revision surgery because the acetabular cup had loosened.  DePuy closed their investigation of the filed complaints finding that "corrective action is not indicated."

35.    Defendants have continued to receive hundreds of similar complaints since 2002 reporting that the Pinnacle MoM Device had failed and forced patients to undergo painful and risky surgery to remove and replace the failed hip.  By June 2006, Defendants had received 50 complaints related to the Pinnacle MoM Device.

36.    Consequently, Defendants were fully aware that the Pinnacle MoM Device was defective and that dozens of patients already had been injured by the Pinnacle MoM Device.  Based on this information, Defendants should have recalled the Pinnacle MoM Device as early as 2006. At a minimum, Defendants should have stopped selling the defective implant when it became aware that it had catastrophically failed in patients.  Over the next two years, patients continued to report failures of the Pinnacle MoM Device. By the end of 2008, Defendants received more than 430 reports, and by the end of 2009, that number skyrocketed to almost 750.

37.    Had Defendants conducted clinical trials of the Pinnacle MoM Device before it was first released on the market in the early 2000's, they would have discovered at that time what they ultimately learned in and around 2007 - that the Pinnacle MoM Device results in a high percentage of patients developing pain,

metallosis, biologic toxicity, and an early and high failure rate due to the release and accumulation of metal particles in the patient's surrounding tissue when there is friction (wear or edge-loading) of the cobalt-chromium metal femoral head that rotates within the cobalt-chromium metal acetabular liner.

38.     The metallic particulates released by friction of the metal-on-metal surfaces can become toxic causing metallosis or cobaltism giving rise to pseudotumors or other conditions.  The formation of metallosis, pseudotumors, and infection and inflammation causes severe pain and discomfort, death of surrounding tissue and bone loss, and a lack of mobility.

39.     Despite the knowledge of the Pinnacle MoM Device's defect and that it had failed hundreds of times, causing hundreds of patients to undergo the agony of another surgery, Defendants continued to market and sell the defective Pinnacle MoM Device implant. In so doing, DePuy actively concealed the known defect from doctors and patients – including Plaintiff and his doctor – and misrepresented that the Pinnacle MoM Device was a safe and effective medical device.

40.     Despite this knowledge, Defendants failed to warn medical providers and/or their customers of the unreasonable dangers associated with the Pinnacle MoM Device and allowed for the continued sale and implantation into patients' bodies.

41.     Up until they stop selling it, the Defendants continued to sell the defective Pinnacle MoM Device to unsuspecting patients without any warning about the risks or the failures that have been reported over the years.

42.     Defendants tout the metal-on-metal Pinnacle MoM Device in brochures saying "the DePuy metal-on-metal (MoM) articulation system is leading the way in advanced technology. Through years of careful engineering, research and expertise, we've created a total hip replacement solution that offers low wear and high stability." [1]

43.     Defendants claim "DePuy Orthopaedics remains the leader in metal-on-metal technology, offering several advantages, including larger diameter bearings that can improve hip range of motion and stability. In fact, one study conducted since the device was approved in 2002 observed that an estimated 99.9 percent of Pinnacle MoM Device components remain in use." [2]  One of the Pinnacle MoM Device designers, William P. Barrett, MD, of Valley Orthopaedic Associates/Proliance Surgeons in Renton, WA, has been quoted in Defendants' marketing materials saying "the Pinnacle cup exhibited 99% survivorship at five years and, significantly, differences between patients, surgeons, femoral stems, head size, and articulation types did not affect survival."

44.     Defendants advertised that "only Pinnacle Hip Solutions feature TrueGlide™ technology, allowing the body to create a thin film of lubrication between

---

[1] "Advancing High Stability and Low Wear" Brochure. The study was presented at the AAOS 2007 Annual Meeting by at least one of the Pinnacle Device designers, William P. Barrett. (Kirk Kindsfater, William Barrett, James Dowd, Carleton Southworth, Marilyn Cassell. Poster #P077, "Midterm Survival of the Pinnacle Multi-Liner Acetabular Cup in a Prospective Multi Center Study," 2007 AAOS Annual Meeting.)

[2]     Pinnacle® Acetabular Cup System (48mm-66mm) Product Overview, http://www.depuy.com/healthcare-professionals/product-details/pinnacle-acetabular-cup-system-48mm-66mm (last visited Sept. 1, 2011).

surfaces. The result is a smooth, more fluid range of natural motion." Defendants distributed a press release stating "the aSphere head, combined with DePuy's exclusive TrueGlide technology, facilitates a more fluid range of natural motion and up to 159 degrees range of motion."

45.    Defendants advertised that "the Pinnacle™ Acetabular Cup System is DePuy's premium product for acetabular indications and can address all existing pathologies."

46.    Defendants advertised that "for the first time surgeons have the choice between high performance bearings which all work within the Pinnacle™ Acetabular Cup System."

47.    Other Pinnacle MoM Device advertisements and brochures included pictures of a man on the beach in wet suit carrying a surf board and a man playing tennis (which specifically describes him as a bilateral replacement). There are pictures of women stretching outside before a jog or yoga, and a woman riding a stationary bike.

48.    Defendants marketed the Pinnacle MoM Device as high performance hip replacements and as superior products that would allow patients to return to their more active lifestyles. Defendants also advertised the Pinnacle MoM Device would last longer than other hip replacement products.

49.    A number of governmental regulatory agencies have recognized the problems that are caused by metal-on-metal implants such as the Pinnacle MoM Device. For instance, The Medicines and Healthcare Products Regulatory Agency

("MHRA") in Britain investigated Defendants' metal-on-metal total hip replacement system after receiving widespread reports of soft tissue reactions and tumor growth in thousands of patients who had received these implants. MHRA has required physicians to establish a system to closely monitor patients known to have metal-on-metal hips by monitoring the cobalt and chromium ion levels in their blood and to evaluate them for related soft tissue reactions.

50.    Similarly, the Alaska Department of Health recently issued a bulletin warning of the toxicity of Defendants' metal-on-metal total hip replacement systems. The State of Alaska, like the MHRA, identified the need for close medical monitoring, surveillance and treatment of all patients who had received these and similar metal-on-metal implants.

51.    Defendants have known for years that implantation of their Pinnacle MoM Device and other metal-on-metal total hip replacement systems results in metallosis, biologic toxicity, and an early and high failure rate. Once the body is exposed to and absorbs the toxic metallic ions and particulate debris from the Pinnacle MoM Device, inflammation occurs causing severe pain, necrosis (death) of the surrounding tissue and bone loss. Pseudotumors also develop and grow as a direct and proximate result of the toxic metallic particles and ions released from the metal-on-metal hip components.

52.    There is no non-surgical solution for elevated cobalt levels.

- 13 -

**C. THE DEFECTIVE PINNACLE MOM DEVICE AND THE
DEFENDANTS' CONDUCT CAUSED INJURIES AND SUBSTANTIAL
DAMAGES TO PLAINTIFF.**

53.    On or about January 20, 2009, Plaintiff underwent a right total hip
arthroplasty at Tampa General Hospital in Tampa, Florida.  Plaintiff's surgeon, Dr.
Thomas Bernasek, implanted a Pinnacle MoM Device with a metal head and a
polyethylene/plastic liner (MoP device) in place of Plaintiff's right hip joint.

54.    On or about May 28, 2009, Plaintiff underwent a left total hip
arthroplasty at Tampa General Hospital in Tampa, Florida. Plaintiff's surgeon, Dr.
Thomas Bernasek, implanted a Pinnacle MoM Device with a metal liner in place of
Plaintiff's left hip joint.

55.    Following the left hip implant surgery, Plaintiff suffered from severe pain
and discomfort, difficulty walking, sitting, and standing, and swelling.  Plaintiff is
continuing to endure the pain and discomfort from his left hip Pinnacle metal-on-metal
device because he has not undergone a revision surgery for either hip.

56.    Had Plaintiff known that the Pinnacle metal-on-metal device caused the
symptoms he is experiencing, Plaintiff would not have elected the Pinnacle metal-on-
metal device.

57.    As a direct and proximate result of the failure of his defective left hip
Pinnacle metal-on-metal device system, Plaintiff sustained and continues to suffer
damages, including, but not limited to, past, present, and future pain and suffering,
severe and possibly permanent injuries, emotional distress, disability, disfigurement,
economic damages (including medical and hospital expenses) monitoring,

- 14 -

rehabilitative and pharmaceutical costs, and lost wages and loss of future earnings capacity. As a result, Plaintiff has sustained and will continue to sustain damages in an amount to be proven at trial.

58.     All of the injuries and complications suffered by Plaintiff were caused by the defective design, warnings, construction and unreasonably dangerous character of the left hip Pinnacle MoM Device that was implanted in him. Had Defendants not concealed the known defects, the early failure rate, the known complications and the unreasonable risks associated with the use of the Pinnacle MoM Device, Plaintiff would not have consented to the Pinnacle MoM Device being used in his left total hip arthroplasty.

## IV.   <u>FRAUDULENT CONCEALMENT</u>

59.     Any applicable statutes of limitations have been tolled by the knowing and active concealment and denial of the facts as alleged herein by Defendants. Plaintiff has been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on his part. Plaintiff could not reasonably have discovered the dangerous nature of and unreasonable adverse side effects associated with the Pinnacle MoM Device prior to the filing of this Complaint.

60.     The Defendants are and were under a continuing duty to disclose the true character, quality and nature of their Pinnacle MoM Device to Plaintiff. Because of Defendants' concealment of the true character, quality and nature of the Pinnacle MoM Device, the Defendants are estopped from relying on any statute of limitations defense.

## V.    CAUSES OF ACTION

### COUNT I
### STRICT PRODUCTS LIABILITY

61.    Plaintiff expressly adopts and incorporates the factual allegations contained in paragraphs 1 through 60 as set forth fully herein.

62.    DePuy has been engaged in the business of designing, developing, testing, manufacturing, marketing, distributing, and selling orthopedic hip implants and did design, manufacture, distribute, market, and sell the Pinnacle MoM Device to medical professionals and patients knowing that they would be implanted in patients in need of hip prostheses.

63.    DePuy had a duty to place into the stream of commerce, manufacture, distribute, market, promote and sell a Pinnacle MoM Device that was neither defective nor unreasonably dangerous when put to the use for which it was designed, manufactured, distributed, marketed, and sold.

64.    DePuy is the designer and manufacturer of the Pinnacle MoM Device and placed this device into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the Pinnacle MoM Device.

65.    DePuy designed, manufactured, distributed, and/or delivered the Pinnacle MoM Device to Plaintiff and his implanting physician. DePuy expected the Pinnacle MoM Devices it was manufacturing to reach, and they did in fact reach, implanting physicians and consumers in the State of Georgia, including Plaintiff and

his implanting physician, without substantial change in the· condition. The Pinnacle
MoM Device manufactured and/or supplied by DePuy were defective in design,
manufacture, and/or formulation and were unreasonably dangerous and more
dangerous than an ordinary consumer would expect.

66.    At the time the Pinnacle MoM Device left the possession of DePuy and
entered the stream of commerce, the Pinnacle MoM Device was in an unreasonably
dangerous or defective condition. The Pinnacle MoM Device was defective because
of inadequate warnings and/or inadequate trials, testing and study, inadequate
exposure of the real risks inherent with the devices as determined by the clinical trials,
inadequate reporting of the results of the clinical trials, and inadequate reporting of
post-marketing clinical experiences with the devices. The devices were also defective
due to inadequate post-marketing warnings or instruction because, after DePuy knew
or had reason to know of the defects and the resulting risk of injury from the Pinnacle
MoM Device, it failed to provide adequate warnings to the medical community,
patients, and the public, including Plaintiff, and continued to promote and advertise
the Pinnacle MoM Devices  as safe and effective. These defects include, but are not
limited to, the following:

(a)    The Pinnacle MoM Device was not reasonably safe as intended to
be used;

(b)    The Pinnacle MoM Device had an inadequate design for the
purpose of hip replacement;

(c)    The Pinnacle MoM Device contained unreasonably dangerous
design defects, including an inherently unstable and defective

design which resulted in an unreasonably high probability of early failure;

(d)     The Pinnacle MoM Device design puts the metal femoral ball directly in contact with the metal acetabular cup which produces a large amount of metal-on-metal wear debris;

(e)     The unstable and defective design resulted in a hip prosthesis which had risks which exceeded the benefits of the medical device;

(f)     The Pinnacle MoM Device has a propensity a high rate of wear, which results in some patients to developing adverse reactions to high levels of metal debris generated by normal use;

(g)     The unstable and defective design resulted in a hip prosthesis which was more dangerous than the ordinary consumer would expect;

(h)     The Pinnacle MoM Device failed to perform in a manner reasonably expected in light of the nature and intended function and subjected Plaintiff to an unreasonable risk of harm beyond that contemplated by an ordinary person;

(i)     DePuy committed manufacturing errors, including, but not limited to, component size tolerances out of specification and not within industry acceptable standards;

(j)     The Pinnacle MoM Device was insufficiently tested;

(k)     The warnings to consumers and their implanting physicians, including Plaintiff and his physicians, about the dangers of the Pinnacle MoM Device were inadequate. Examples of the inadequacy of Defendants' warnings include, but are not limited to, one or more of the following particulars:

   i.     The Pinnacle MoM Devices contained warnings insufficient to alert Plaintiff and his physicians as to the risk of adverse events and/or reactions associated with the implant, subjecting Plaintiff to risks which exceeded the benefits of the implant;

   ii.    The Pinnacle MoM Device contained misleading warnings emphasizing the efficacy of the device while downplaying the risks associated with it thereby making use of the device more dangerous than the ordinary consumer would expect;

iii.    The Pinnacle MoM Device contained insufficient and/or incorrect warnings to alert consumers, including Plaintiff through his physicians, regarding the risk, scope, duration, and severity of the adverse reactions associated with the device;

iv.    The Pinnacle MoM Device did not disclose that it was inadequately tested;

v.    The Pinnacle MoM Device failed to convey adequate post-marketing warnings regarding the risk, severity, scope and/or duration of the dangers posed by the devices including, but not limited to, the abnormal and unusually high risk of revision surgery; and

vi.    The Pinnacle MoM Device failed to contain instructions sufficient to alert consumers to the dangers posed and to give them the information necessary to avoid or mitigate those dangers including, but not limited to, the dangerous and devastating effects of the metal debris to surrounding tissue and/or migration through the body.

67.    Plaintiff used the Pinnacle MoM Device for the intended purpose, i.e., hip replacement.

68.    Plaintiff could not have discovered any defect in the Pinnacle MoM Device through the exercise of due care.

69.    DePuy, as the designer and manufacturer of medical devices, is held to the level of knowledge of an expert in the field.

70.    Plaintiff and his implanting physician did not have substantially the same knowledge as DePuy.

71.    The Pinnacle MoM Device is unreasonably dangerous. DePuy knew or should have known of the dangerous condition of these products and therefore should not have marketed, sold and/or placed these products on the market. A reasonably

prudent manufacturer aware of the dangerous condition posed by the Pinnacle MoM Device would not have marketed, sold and/or placed the device on the market.

72.     The Pinnacle MoM Devices designed, developed, tested, manufactured, and sold by DePuy were in a dangerous and defective condition and posed a threat to any user or consumer.  Plaintiff was and is in a class of persons that DePuy should have considered to be subject to the harm caused by the defective nature of the Pinnacle MoM Device .

73.     The Pinnacle MoM Device was implanted and used in the manner for which they were intended. This use has resulted in severe physical and emotional and other injuries to Plaintiff.

74.     DePuy knew or should have known through testing, adverse event reporting, or otherwise, that the Pinnacle MoM Device created a high risk of bodily injury and serious harm.

75.     DePuy failed to provide adequate and timely warnings or instructions regarding the Pinnacle MoM Device and its known defects.

76.     As a direct and proximate result of DePuy's defective design, failure to warn, lack of quality control and other wrongful conduct, Plaintiff has sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages. Plaintiff has expended and will expend money for medical bills and expenses, and he has been unable to and will in the future be unable to attend to his normal affairs and duties for an indefinite period of time.

77.    Plaintiff is entitled to compensatory damages against DePuy for strict products liability in an amount to be proven at trial.

WHEREFORE, the Plaintiff demands judgment against Defendants, and each of them, individually, jointly and severally, and requests compensatory damages in a sum in excess of $75,000.00 and punitive damages where applicable, together with costs and interest, and any further relief as the court deems proper, as well as a trial by jury of all issues to be tried.

## COUNT II
## NEGLIGENCE, INCLUDING GROSSLY NEGLIGENT CONDUCT

78.    Plaintiff expressly adopts and incorporates the factual allegations contained in paragraphs 1 through 60 as set forth fully herein.

79.    At all material times, Defendants had a duty to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, sale, testing, quality assurance, quality control and/or distribution of the Pinnacle MoM Device into the stream of commerce, including a duty to assure that the device would not cause those who had it surgically implanted to suffer adverse harmful effects from it.

80.    Defendants failed to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, sale, testing, quality assurance, quality control and/or distribution of the Pinnacle MoM Device into interstate commerce in that Defendants knew or should have known that this product created a

high risk of unreasonable, dangerous side effects, thereby breaching their duty to consumers, including Plaintiff.

81.     The negligence of Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

(a)     Negligently designing the Pinnacle MoM Device in a manner which was dangerous to those individuals who had the device surgically implanted;

(b)     Designing, manufacturing, producing, creating and/or promoting the Pinnacle MoM Device without adequately, sufficiently, or thoroughly testing it;

(c)     Not conducting sufficient testing programs to determine whether or not the Pinnacle MoM Device was safe for use;

(d)     Defendants herein knew or should have known that Pinnacle MoM Device was unsafe and unfit for use by reason of the dangers to its users;

(e)     Selling the Pinnacle MoM Device without making proper and sufficient tests to determine the danger to its users;

(f)     Negligently failing to adequately and correctly warn Plaintiff or his physicians, hospitals and/or healthcare providers of the dangers of the Pinnacle MoM Device ;

(g)     Negligently failing to recall their dangerous and defective Pinnacle MoM Device at the earliest date that it became known that the device was, in fact, dangerous and defective;

(h)     Failing to provide adequate instructions regarding the safety precautions to be observed by surgeons who would reasonably and foreseeably come into contact with, and more particularly, implant the Pinnacle MoM Device into their patients;

(i)     Negligently advertising and recommending the use of the Pinnacle MoM Device despite the fact that Defendants knew or should have known of its dangerous propensities;

(j)    Negligently representing that the Pinnacle MoM Device offered was safe for use for its intended purpose, when, in fact, it was unsafe;

(k)    Negligently manufacturing the Pinnacle MoM Device in a manner which was dangerous to those individuals who had it implanted;

(l)    Negligently producing the Pinnacle MoM Device in a manner which was dangerous to those individuals who had it implanted;

(m)    Negligently assembling the Pinnacle MoM Device in a manner which was dangerous to those who had it implanted; and

(n)    Defendants under-reported, underestimated and downplayed the serious danger of the Pinnacle MoM Device .

82.    Defendants were negligent in the designing, researching, supplying, manufacturing, promoting packaging, distributing, testing, advertising, warning, marketing and sale of the Pinnacle MoM Device in that they:

(a)    Failed to use due care in designing and manufacturing the Pinnacle MoM Device so as to avoid the aforementioned risks to individuals that had the devices surgically implanted;

(b)    Failed to accompany their product with proper warnings;

(c)    Failed to accompany their product with proper instructions for use;

(d)    Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of the Pinnacle MoM Device; and

(e)    Were otherwise careless and/or negligent.

83.    Upon information and belief, Defendants continued to market, manufacture distribute and/or sell the Pinnacle MoM Device to consumers, including Plaintiff, despite the fact that Defendants knew or should have known that the

Pinnacle MoM Device caused unreasonable, dangerous side effects which many users
would be unable to remedy by any means, when there were safer alternative methods
of hip replacements.

84.    Defendants knew or should have known that consumers such as Plaintiff
would suffer foreseeable injuries as a result of Defendants' failure to exercise ordinary
care as described above.

WHEREFORE, the Plaintiff demands judgment against Defendants, and each
of them, individually, jointly and severally, and requests compensatory damages in a
sum in excess of $75,000.00, together with costs and interest, and any further relief as
the court deems proper, as well as a trial by jury of all issues to be tried.

## COUNT III
## GROSS NEGLIGENCE

85.    Plaintiff expressly adopts and incorporates the factual allegations
contained in paragraphs 1 through 60 as set forth fully herein.

86.    At all material times, Defendants had a duty to exercise reasonable care
in the designing, researching, manufacturing, marketing, supplying, promoting, sale,
testing, quality assurance, quality control and/or distribution of the Pinnacle MoM
Device into the stream of commerce, including a duty to assure that the device would
not cause those who had it surgically implanted to suffer adverse harmful effects from
it.

87.    Defendants failed to exercise ordinary care in the designing, researching,
manufacturing, marketing, supplying, promoting, sale, testing, quality assurance,

quality control and/or distribution of the Pinnacle MoM Device into interstate commerce in that Defendants knew or should have known that this product created a high risk of unreasonable, dangerous side effects, thereby breaching their duty to consumers, including Plaintiff.

88.    Defendants' failure to exercise ordinary care as described above in this Count, was grossly negligent, i.e., was so reckless or wanton in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct."

89.    The gross negligence of Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

    (a)    Designing the Pinnacle MoM Device in a manner which was dangerous to those individuals who had the device surgically implanted;

    (b)    Designing, manufacturing, producing, creating and/or promoting the Pinnacle MoM Device without adequately, sufficiently, or thoroughly testing it;

    (c)    Not conducting sufficient testing programs to determine whether or not the Pinnacle MoM Device was safe for use;

    (d)    Defendants herein knew or should have known that Pinnacle MoM Device was unsafe and unfit for use by reason of the dangers to its users;

    (e)    Selling the Pinnacle MoM Device without making proper and sufficient tests to determine the danger to its users;

    (f)    Failing to adequately and correctly warn Plaintiff or his physicians, hospitals and/or healthcare providers of the dangers of the Pinnacle MoM Device;

(g)    Failing to recall their dangerous and defective Pinnacle MoM
Device at the earliest date that it became known that the device
was, in fact, dangerous and defective;

(h)    Failing to provide adequate instructions regarding the safety
precautions to be observed by surgeons who would reasonably and
foreseeably come into contact with, and more particularly, implant
the Pinnacle MoM Device into their patients;

(i)    Advertising and recommending the use of the Pinnacle MoM
Device despite the fact that Defendants knew or should have
known of its dangerous propensities;

(j)    Representing that the Pinnacle MoM Device offered was safe for
use for its intended purpose, when, in fact, it was unsafe;

(k)    Manufacturing the Pinnacle MoM Device in a manner which was
dangerous to those individuals who had it implanted;

(l)    Producing the Pinnacle MoM Device in a manner which was
dangerous to those individuals who had it implanted;

(m)    Assembling the Pinnacle MoM Device in a manner which was
dangerous to those who had it implanted; and

(n)    Defendants under-reported, underestimated and downplayed the
serious danger of the Pinnacle MoM Device .

90.    Defendants were negligent in the designing, researching, supplying,

manufacturing, promoting packaging, distributing, testing, advertising, warning,

marketing and sale of the Pinnacle MoM Device in that they:

(a)    Failed to use due care in designing and manufacturing the
Pinnacle MoM Device so as to avoid the aforementioned risks to
individuals that had the devices surgically implanted;

(b)    Failed to accompany their product with proper warnings;

(c)    Failed to accompany their product with proper instructions for
use;

(d)  Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of the Pinnacle MoM Device; and

(e)  Were otherwise careless and/or negligent.

91.    Upon information and belief, Defendants continued to market, manufacture distribute and/or sell the Pinnacle MoM Device to consumers, including Plaintiff, despite the fact that Defendants knew or should have known that the Pinnacle MoM Device caused unreasonable, dangerous side effects which many users would be unable to remedy by any means, when there were safer alternative methods of hip replacements.

92.    Defendants knew or should have known that consumers such as Plaintiff would suffer foreseeable injuries as a result of Defendants' failure to exercise ordinary care as described above.

93.    At all material times, Defendants knew of the defective nature of the Pinnacle MoM Device as set forth herein, and continued to design, manufacture, market and sell the drug so as to maximize sales and profits at the expense of public health and safety, and as such Defendants' conduct was grossly negligent, i.e., "was so reckless or wanton in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct"; and further, upon information and belief, Defendants exhibited such an entire want of care as to establish that their actions were a result of fraud, evil motive, actual malice and a conscious and deliberate disregard of foreseeable harm to Plaintiff herein.

WHEREFORE, the Plaintiff demands judgment against Defendants, and each of them, individually, jointly and severally, and requests compensatory damages in a sum in excess of $75,000.00 and punitive damages where applicable, together with costs and interest, and any further relief as the court deems proper, as well as a trial by jury of all issues to be tried.

## COUNT IV
## NEGLIGENCE MISREPRESENTATION

94.    Plaintiff expressly adopts and incorporates the factual allegations contained in paragraphs 1 through 60 as set forth fully herein.

95.    At the time Defendants manufactured, designed, marketed, sold and distributed the Pinnacle MoM Device for use by Plaintiff, Defendants knew or should have known of the use for which the Pinnacle MoM Device was intended and the serious risks and dangers associated with such use of the Pinnacle MoM Device.

96.    Defendants owed a duty to treating physicians and to the ultimate end-users of the Pinnacle MoM Device, Plaintiff, to accurately and truthfully represent the risks of the Pinnacle MoM Device. Defendants breached that duty by misrepresenting and/or failing to adequately warn Plaintiff's physicians, the medical community, Plaintiff and the public about the risks of the Pinnacle MoM Device, which Defendants knew or in the exercise of diligence should have known.

97.    As a direct result of Defendants' conduct, Plaintiff has suffered and continues to suffer serious and permanent non-economic and economic injuries and Defendants are liable to Plaintiff in an amount to be determined at trial.

WHEREFORE, the Plaintiff demands judgment against Defendants, and each of them, individually, jointly and severally, and requests compensatory damages in a sum in excess of $75,000.00 and punitive damages where applicable, together with costs and interest, and any further relief as the court deems proper, as well as a trial by jury of all issues to be tried.

## COUNT V
## FRAUDULENT CONCEALMENT

98.  Plaintiff expressly adopts and incorporates the factual allegations contained in paragraphs 1 through 60 as set forth fully herein.

99.  Defendants fraudulently concealed information with respect to the Pinnacle MoM Device in the following particulars:

> (a)  Defendants represented through the labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that the Pinnacle MoM Device was safe and fraudulently withheld and concealed information about the substantial risks of using the Pinnacle MoM Device; and

> (b)  Defendants represented that the Pinnacle MoM Device was safer than other alternative medications and fraudulently concealed information which demonstrated that the Pinnacle MoM Device was not safer than alternatives available on the market.

100.  Defendants had sole access to material facts concerning the dangers and unreasonable risks of the Pinnacle MoM Device.

101.  The concealment of information by Defendants about the risks of the Pinnacle MoM Device was intentional, and the representations made by Defendants were known by Defendants to be false.

102.    The concealment of information and the misrepresentations about the Pinnacle MoM Device were made by Defendants with the intent that doctors and patients, including Plaintiff, rely upon them.

103.    Plaintiff and his physicians relied upon the representations and were unaware of the substantial risks of the Pinnacle MoM Device which Defendants concealed from the public, including Plaintiff and his physicians.

104.    Plaintiff was injured as a direct and proximate result of Defendants' actions, omissions, and misrepresentations. Plaintiff has incurred, and will continue to incur expenses as a result of using the Pinnacle MoM Device.

WHEREFORE, the Plaintiff demands judgment against Defendants, and each of them, individually, jointly and severally, and requests compensatory damages in a sum in excess of $75,000.00 and punitive damages where applicable, together with costs and interest, and any further relief as the court deems proper, as well as a trial by jury of all issues to be tried.

## COUNT VI
## BREACH OF EXPRESS WARRANTY

105.    Plaintiff expressly adopts and incorporates the factual allegations contained in paragraphs 1 through 60 as set forth fully herein.

106.    Defendants expressly warranted to Plaintiff by and through Defendants and/or their authorized agents or sales representatives, in publications, package inserts, the internet, and other communications intended for physicians, patients,

Plaintiff, and the general public, that the Pinnacle MoM Device was safe, effective, fit and proper for its intended use.

107.    The    Pinnacle MoM Device does not conform to those express representations because the  Pinnacle MoM Device is not safe and has serious, life-threatening side effects.

108.    In allowing the implantation of the  Pinnacle MoM Device, Plaintiff and his physician relied on the skill, judgment, representations, and express warranties of Defendants.  These warranties and representations were false in that the  Pinnacle MoM Device was not safe and was unfit for the uses for which it was intended.

109.    Defendants breached their warranty of the mechanical soundness of the Pinnacle MoM Device by continuing sales and marketing campaigns highlighting the safety and efficacy of their product, while they knew of the defects and risk of product failure and resulting patient injuries.

110.    As a direct result of Defendants' conduct, Plaintiff has suffered and continues to suffer serious and permanent non-economic and economic injuries and Defendants are liable to Plaintiff in an amount to be determined at trial.

WHEREFORE, the Plaintiff demands judgment against Defendants, and each of them, individually, jointly and severally, and requests compensatory damages in a sum in excess of $75,000.00 and punitive damages where applicable, together with costs and interest, and any further relief as the court deems proper, as well as a trial by jury of all issues to be tried.

## COUNT VII
## BREACH OF IMPLIED WARRANTY

111.   Plaintiff expressly adopts and incorporates the factual allegations contained in paragraphs 1 through 60 as set forth fully herein.

112.   Defendants impliedly warranted to prospective purchasers and users, including Plaintiff, that the Pinnacle MoM Device was safe, merchantable, and fit for the ordinary purposes for which said product was to be used.

113.   Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether the Pinnacle MoM Device was of merchantable quality and safe and fit for its intended use.

114.   Upon information and belief, and contrary to such implied warranties, the Pinnacle MoM Device was not of merchantable quality or safe and fit for its intended use, because the product was and is unreasonably dangerous and unfit for the ordinary purposes for which it was used, as described above.

115.   As a direct and proximate result of the breach of implied warranties by Defendants, Plaintiff suffered and will continue to suffer harm and economic loss as described above.

WHEREFORE, the Plaintiff demands judgment against Defendants, and each of them, individually, jointly and severally, and requests compensatory damages in a sum in excess of $75,000.00 and punitive damages where applicable, together with costs and interest, and any further relief as the court deems proper, as well as a trial by jury of all issues to be tried.

## COUNT VIII
## FRAUD

116.   Plaintiff expressly adopts and incorporates the factual allegations contained in paragraphs 1 through 60 as set forth fully herein.

117.   Defendants made representations to Plaintiff and his physicians that their Pinnacle MoM Device is a high-quality, safe and effective hip replacement system.

118.   Before they marketed the Pinnacle MoM Device that was implanted in Plaintiff, Defendants knew or should have known of the unreasonable dangers and serious health risks that such a metal-on-metal total hip replacement system posed to patients like Plaintiff.

119.   As specifically described in detail above, Defendants knew that the Pinnacle MoM Device subjected patients to early failure, painful and harmful physical reactions to toxic metallic particles and ions, death of tissue, bone loss and the need for explants and revision surgery.

120.   Defendants' representations to Plaintiff and his physicians that their Pinnacle MoM Device is high-quality, safe and effective were false.

121.   Defendants concealed their knowledge of the unreasonable risks and dangers associated with the use of the Pinnacle MoM Device to induce Plaintiff and many thousands of others to purchase the system for surgical implantation in their bodies.

122.   Neither Plaintiff nor his physicians knew of the falsity of Defendants' statements regarding the Pinnacle MoM Device.

123.   Plaintiff and his physicians relied upon and accepted as truthful Defendants' representations regarding the Pinnacle MoM Device.

124.   Plaintiff and his physicians had a right to rely on Defendants' representations and in fact did rely upon such representations.  Had Plaintiff known of the high risks associated with the Pinnacle MoM Device, he would not have purchased or allowed the Pinnacle MoM Device to have been surgically implanted in him.

125.   Any applicable statutes of limitation have been tolled by Defendants' knowing and active concealment and misrepresentations alleged here.  Plaintiff and others were kept in ignorance of vital information, without any fault or lack of diligence on their part, had no knowledge of the above facts and could not reasonably have discovered the fraudulent nature of Defendants' conduct.

WHEREFORE, the Plaintiff demands judgment against Defendants, and each of them, individually, jointly and severally, and requests compensatory damages in a sum in excess of $75,000.00 and punitive damages where applicable, together with costs and interest, and any further relief as the court deems proper, as well as a trial by jury of all issues to be tried.

## COUNT IX
## PUNITIVE DAMAGES

126.   Plaintiff expressly adopts and incorporates the factual allegations contained in paragraphs 1 through 60 as set forth fully herein.

127.    Plaintiff is entitled to punitive damages because Defendants' wrongful acts and/or omissions were either intentional, i.e., Defendants had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage, or grossly negligent, i.e., Defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.". Defendants misled both the medical community and the public at large, including Plaintiff, by making false representations about the safety and efficacy of the Pinnacle MoM Device and by failing to provide adequate instructions and training concerning its use.

128.    Defendants downplayed, understated, and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use of the Pinnacle MoM Device despite available information demonstrating that the Pinnacle MoM Device could cause particles of cobalt and chromium to be deposited into Plaintiff's body and cause the device to loosen and become displaced or separate, causing serious harm to patients. Such risks and adverse effects could easily have been avoided had Defendants not concealed knowledge of the serious risks associated with the Pinnacle MoM Device or provided proper training and instruction to physicians regarding use of the Pinnacle MoM Device.

129.    Defendants' misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiff, concerning the safety of the Pinnacle MoM Device.

130.    Defendants were or should have been in possession of evidence demonstrating that the Pinnacle MoM Device caused serious side effects. Nevertheless, Defendants continued to market the Pinnacle MoM Device by providing false and misleading information with regard to its safety and efficacy.

131.    Defendants failed to provide warnings that would have dissuaded health care professionals from using the Pinnacle MoM Device, thus preventing health care professionals, including Plaintiff's surgeon, and consumers, including Plaintiff, from weighing the true risks against any benefits of using the Pinnacle MoM Device.

132.    Defendants failed to provide adequate training and instructions to surgeons, including Plaintiff's surgeon, who could have prevented failure of the Pinnacle MoM Device causing serious harm and suffering to patients, including Plaintiff.

133.    As a result of Defendants' conduct, Defendants are liable to Plaintiff in an amount to be determined at trial.

WHEREFORE, the Plaintiff demands judgment against Defendants, and each of them, individually, jointly and severally, and requests compensatory damages in a sum in excess of $75,000.00 and punitive damages where applicable, together with costs and interest, and any further relief as the court deems proper, as well as a trial by jury of all issues to be tried.

## <u>PRAYER FOR RELIEF AS TO ALL COUNTS</u>

WHEREFORE, Plaintiff, Billy Nation, prays for judgment against

Defendants as follows:

1.      Judgment in favor of Plaintiff and against all Defendants, for damages in
such amounts as may be proven at trial;

2.      Compensation for both economic and non-economic losses, including
but not limited to medical expenses, loss of earnings, pain and suffering, mental
anguish and emotional distress, in such amounts as may be proven at trial;

3.      Punitive and/or exemplary damages in such amounts as may be proven
at trial;

4.      Attorneys' fees, expenses and costs of this action;

5.      Pre- and post-judgment interest as provided by law; and

6.      Any and all further relief, both legal and equitable, that the Court may
deem just and proper.


Dated: August 30, 2023

<u>/s/ James W. Lampkin II</u>
James W. Lampkin II (lead counsel)
Navan Ward, Jr.
David B. Byrne, III
Aigner S. Kolom
Beasley, Allen, Crow, Methvin,
Portis & Miles, P.C.

Post Office Box 4160
Montgomery, AL 36103
Telephone: (334) 269-2343
Facsimile: (334) 954-7555
James.lampkin@beasleyallen.com
Navan.ward@beasleyallen.com
David.byrne@beasleyallen.com
Aigner.kolom@beasleyallen.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2023, I electronically filed the foregoing
Plaintiff's Amended Complaint with Clerk of the Court using CM/ECF system
which will send notification of such filing to all parties that are CM/ECF
participants in this action.

/s/ James W. Lampkin II
James W. Lampkin II